RUDY KIM (CA SBN 199426)
RudyKim@mofo.com
ROMAN A. SWOOPES (CA SBN 274167)
RSwoopes@mofo.com
MORRISON & FOERSTER LLP
755 Page Mill Road
Palo Alto, California 94304-1018
Telephone: 650.813.5600
Facsimile: 650.494.0792

Attorneys for Defendant
AUTODESK, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| NATURE SIMULATION SYSTEMS INC., | Case No.    3:19-cv-03192-SK |
| Plaintiff, | **DECLARATION OF DANIEL G. ALIAGA IN SUPPORT OF AUTODESK'S CLAIM CONSTRUCTION POSITIONS** |
| v. | |
| AUTODESK, INC., | |
| Defendant. | |

I, Daniel G. Aliaga, declare as follows:

1.      I submit this declaration in support of Autodesk's claim construction proposals for U.S. Patent Nos. 10,120,961 (the "'961 patent") and 10,109,105 (the "'105 patent").  I have personal knowledge of the facts set forth in this declaration and, if called upon as a witness, I could and would testify to such facts under oath.

**I.      SUMMARY OF OPINIONS**

2.      It is my opinion that to a person of ordinary skill in the art, the following terms do not and did not have an ordinary and customary meaning, including at the time of the alleged invention, and are indefinite:

- "modified Watson method" (see pages 4-9);
- "searching neighboring triangles of the last triangle pair that holds the last intersection point" (see pages 9-13);
- "regrouping facets in separate steps that includes copying triangles, deleting triangles, reversing the normal of each triangle of a geometric object, and merging reserved triangles to form one or more new extended triangle sets" (see pages 13-15);
- "regular points" (see pages 17-18);
- "BIOpTriangleSet," (see pages 18-20); and
- "according to m_ID of the member m_Points of each triangle, deciding whether it is a boundary triangle" (see pages 20-21).

3.      Furthermore, it is my opinion that to a person of ordinary skill in the art, the following term has and had an ordinary and customary meaning, including at the time of the alleged invention:

- "surface trimming" (see pages 15-16).

**II.     QUALIFICATIONS**

4.      My curriculum vitae, attached as Exhibit A, provides an accurate identification of my relevant background and experience.

5.      I graduated *magna cum laude* from Brown University in 1991, receiving my B.Sc.

in Computer Science and writing an Honor's Thesis related to computer graphics.  I then proceeded to study computer science, focusing on computer graphics, at the University of North Carolina at Chapel Hill, where I received my M.S. in Computer Science in 1993 and my Ph.D. in 1999.

6.     During my educational formation, I worked for several companies, including IBM, Silicon Graphics, Siemens, and Division Inc.  After receiving my Ph.D., I worked as a full-time graphics and imaging researcher at Lucent Technologies Bell Laboratories until December 2002.  Subsequently, I obtained a full time research position at Princeton University and then began my academic career at Purdue University in August 2003.  I have been at Purdue University ever since, and I am currently an Associate Professor of Computer Science.  In addition, I have been a visiting professor in the Department of Computer Science at ETH Zurich, in the Department of Architecture at ETH Zurich, in the Department of Computer Science at King Abdullah University of Science and Technology in Saudi Arabia, and at INRIA (French Computer Science/Computer Graphics Research Institute).  Furthermore, I have roles in several startups, and I am a named inventor on eight patents to date.  I have also received an Organization for Economic Co-operation and Development (OECD) Fellowship, a Discovery Park Faculty Research Fellowship, and Fulbright Scholar Award.

7.     My first computer graphics publication was in 1990, and I have since published over 120 peer-reviewed publications in top journals and conferences.

8.     I have chaired and served on numerous ACM and IEEE conference and workshop committees, including being a member of more than 70 program committees, a conference chair, a papers chair, an invited speaker, and an invited panelist.  I also participate in several ongoing international multi-disciplinary collaborations (i.e., with world experts in computer science, photogrammetry, urban planning, architecture, meteorology, atmospheric sciences, earth sciences, traffic engineering, and more) and have given over 50 invited talks and presentations (including in the United States, Brazil, Colombia, Ecuador, France, Japan, Korea, Peru, Qatar, Sweden, and Switzerland).  Moreover, I have served on several National Science Foundation ("NSF") panels and on the editorial board of Computer Graphics Forum and of Graphical Models.  I am also a

1  member of ACM SIGGRAPH.

2      9.      My research has been wholly or partially funded by over $7 million in funds from

3  NSF, Metropolitan Transportation Commission (of the State of California), Microsoft Research,

4  Google, IARPA, Internet2, and Adobe Inc.

5      10.     In my career in academia, I have been performing research, publishing papers, and

6  producing software primarily in the field of computer graphics, but also in visualization and

7  computer vision.  In addition, I am the instructor for undergraduate and graduate computer

8  graphics courses covering geometric operations, geometric modeling, triangulation, rendering,

9  lighting, and other topics.  The major part of my computer graphics work has been developing 3D

10  modeling and rendering algorithms, including methods for geometric modeling and 3D

11  reconstruction of objects and of scenes.  All of these techniques employ graphics software and

12  hardware, and many benefit from modern GPUs and GPU programming using OpenGL, GLSL,

13  CUDA, Qt, and other libraries.

14  **III.    MATERIALS REVIEWED**

15      11.     I have reviewed the claims and specifications of the '961 patent and the '105

16  patent; their prosecution histories; D. F. Watson, "Computing the n-dimensional Delaunay

17  tessellation with application to Voronoi polytopes," The Computer Journal 24 (2) 1981, the Joint

18  Claim Construction and Prehearing Statement (and the materials cited therein), and Nature

19  Simulation Systems' claim construction brief in preparing the opinions I present in this

20  declaration.

21  **IV.    RELEVANT LEGAL STANDARDS**

22      12.     I understand that a court construing a patent claim seeks to give a claim the

23  meaning it would have to a person of ordinary skill in the art ("POSITA") at the time of the

24  invention.  I understand that claim construction requires consideration of the words of the claims

25  themselves, the remainder of the specification, the prosecution history, and extrinsic evidence

26  concerning relevant scientific principles, the meaning of technical terms, and the state of the art.  I

27  also understand that the specification may reveal a special definition given to a claim term by the

28  patentee that differs from the meaning it would otherwise possess and that in such cases, the

1   inventor's lexicography governs.

2       13.    I understand that the claims of a patent, viewed in the context of the specification

3   and prosecution history, must inform a person of ordinary skill in the art at the time of the claimed

4   subject matter as to the scope of the subject matter with reasonable certainty.  I understand that a

5   patent claim is invalid due to indefiniteness when it fails to inform with reasonable certainty those

6   skilled in the art about the scope of the claimed subject matter when read in light of the

7   specification and the prosecution history.  I understand that while absolute precision is

8   unattainable, the definiteness requirement nonetheless mandates clarity.

9       **V.**    **LEVEL OF SKILL IN THE ART**

10      14.    I believe that a person skilled in the art of the '961 patent and the '105 patent

11  would have had at least a master's degree in computer science or a related field, or a bachelor's

12  degree in computer science or a related field plus two years of relevant experience, with

13  experience in computer graphics, computer-aided design, solid modeling, or geometric modeling.

14  Based on my experience, I understand how a POSITA would have understood and used the

15  terminology in the field of the '961 and '105 patents and in the relevant art at the time of the

16  asserted patents' filings.

17      **VI.**    **OPINIONS RELATING TO CLAIM TERMS**

18      **A.**    **"modified Watson method" ('961 and '105 patents)**

| NSS | Autodesk |
|---|---|
| [ordinary meaning] | [indefinite] |

21      15.    I understand that Nature Simulation Systems (NSS) has argued that the term

22  "modified Watson method" has a plain and ordinary meaning and requires no construction.  I

23  disagree with this position because "modified Watson method" is not a known term of art.  To be

24  clear, I am familiar with the Delaunay method, which is a known method of triangulation that is

25  mentioned in the patents.  (*See, e.g.*, '961 patent at 6:64-66; '105 patent, 6:42-44.)  And I am also

26  aware of the "Watson" algorithm for computing a Delaunay triangulation that is described in a

27  1981 paper by D.F. Watson cited in the patents.  (*Id.*)  However, in my professional experience,

28  "modified Watson method" does not have a standardized meaning.  It does not have and did not

have an ordinary and customary meaning, including at the time of the alleged invention, to a POSITA.

16.     Since "modified Watson method" does not have a customary meaning to a POSITA, I searched for its meaning in the '961 and the '105 patents themselves.  While the term is mentioned seven times in the patents, it is not clearly defined anywhere.  Claim 1 of both patents states that "the modified Watson method includes removing duplicate intersection points, identifying positions of end intersection points, and splitting portion of each triangle including an upper portion, a lower portion, and a middle portion," but this language does not resolve the confusion.  For example, the patent does not describe how to identify "duplicate intersection points."  Moreover, the phrase "splitting portion of each triangle including an upper portion, a lower portion, and a middle portion" is ambiguous.  It could refer to (a) splitting an upper portion, splitting a lower portion, and splitting a middle portion of each triangle; (b) splitting one portion of each triangle, if that triangle has an upper portion, a lower portion, and a middle portion; (c) splitting each triangle into an upper portion, a lower portion, and a middle portion; or (d) something else.  It is also unclear why a triangle split by a line would have three portions.  Also, neither Delaunay triangulation nor Watson's algorithm deal with intersection points, so it would not be clear how intersection points fit into the "modified Watson method."

17.     It is not even clear from the patents what the claimed "Watson method" is—i.e., which specific steps from Watson's algorithm are incorporated into the patents, and which are not—so it is not clear what specific steps are being modified or added.  Figure 13 of the patents provides no clarification.  The patents state that "FIG. 13 is the flowchart of Delaunay mesh modified Watson method that created the sequence of FIGS. 12A through 12H."  ('961 patent, 3:39-41; '105 patent, 3:26-28.)  Figure 13 of the '961 patent is shown below:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



FIG. 13 Prior Art except the first two (2) steps , the last one, and the condition Any triangle contains the point.

The patents also contain a block of text that appears to roughly correspond to the flowchart in Figure 13.  (*See* '961 patent, 7:2-32 ("The modified Delaunay 2D mesh method contains the following steps...."); '105 patent, 6:48-7:9 (same).)  The label at the bottom of Figure 13 of the '961 patent specifies which steps are prior art and which are not: "Prior art except for the first two (2) steps, the last one, and the condition Any triangle contains the point."[1]  But Figure 13 and the accompanying text are inconsistent with the claim language "the modified Watson method includes removing duplicate intersection points, identifying positions of end intersection points, and splitting portion of each triangle including an upper portion, a lower portion, and a middle portion."  This claim language does not appear in Figure 13.  Moreover, the claim language states that the modified Watson method "includes" the aforementioned recited steps, which do not appear in Figure 13.  In addition, the claim language does not specify which steps from Watson's algorithm are incorporated into the claim.

18.     I understand that in its opening claim construction brief, NSS apparently argued that "modified Watson method" has a definite meaning because claim 1's condition of "splitting each triangle through which an intersection line passes" sets it apart from the prior art, where "Watson defined the splitting condition as the triangle's circumcircle containing the point."  (ECF No. 35 at 8.).  The relevant specification passage cited by NSS states:  "For each point, check every triangle in the triangle set whether its circumcircle contains the point or the last segment passes through the triangle."  ('961 patent, 7:19-21.)  If NSS is suggesting that the very condition of splitting triangles on the intersection line is what "modifies" the Watson method, a POSITA would not have understood the claimed "modification" to eliminate the use of circumcircles from the "Watson method" of claim 1.  Moreover, NSS' argument does not address the fact that the patent fails to make clear how the triangles on the intersection line are split according to the "modified Watson method" or what steps one must follow in order to perform such splitting.  A POSITA could inspect Watson's 1981 paper to search for references to "splitting each triangle through which an intersection line passes," however, this would be fruitless since Watson's

---

[1] This label is absent from Figure 13 of the '105 patent.

1  method is for computing a Delaunay triangulation, and not for splitting triangles by intersection

2  lines.  Thus, a POSITA would not have been able to answer these questions based on the claims

3  or the specification, and would thus not have been able to ascertain a definite meaning for

4  "modified Watson method."

5       19.    Figures 12A through 12H, cited in NSS' brief, add no clarity.



'961 patent
FIGS. 12A-12H

FIG. 12A Prior Art   FIG. 12B Prior Art   FIG. 12C Prior Art   FIG. 12D Prior Art

FIG. 12E Prior Art   FIG. 12F Prior Art   FIG. 12G   FIG. 12H

'105 patent
FIGS. 12A-12H

FIG. 12A   FIG. 12B   FIG. 12C   FIG. 12D

FIG. 12E   FIG. 12F   FIG. 12G   FIG. 12H

Although the labels below FIGS. 12A-12F in the '961 patent say "Prior Art," unlike the labels

below FIGS. 12G-12H, the patent's specification does not describe what, if anything distinguishes

the algorithms used to create FIGS. 12A-12F from that used in FIGS. 12G-12H.  The '105

patent's figures do not even contain labels to distinguish what is prior art from what is

purportedly new.  In both patents, the most the specification states of these figures is as follows:

"FIGS. 12A through 12H show a Delaunay mesh sequence in which each intersection point is

inserted into the mesh step by step.  FIG. 13 is the flowchart of Delaunay mesh modified Watson method that created the sequence of FIGS. 12A through 12H." ('961 patent, 3:36-41; '105 patent, 3:23-28.)  This text suggests that the *same* technique was used to create FIGS. 12A-12H.  A POSITA would not understand from FIGS. 12A-12H or the accompanying text how, if at all, the Watson method had been modified.

20.    I understand that NSS argued in its opening claim construction brief that because claim 6 of the '961 patent includes an alleged example of a "modified Watson method," the same term in claim 1 must have a definite meaning.  In my opinion, a person of ordinary skill in the art would not have been able to rely on claim 6 to understand claim 1.  It is my understanding that, as a dependent claim, claim 6 covers a more specific invention than claim 1, from which it depends. Thus, a POSITA would not have been able to determine what other steps can be involved in a "modified Watson method," or what other algorithms might qualify, for purposes of claim 1.

21.    In summary, the term "modified Watson method" is amenable to more than one interpretation, so it is ambiguous and not capable of construction.  As the specifications and prosecution histories of the patents fail to inform a POSITA with reasonable certainty as to the scope of the claim, I believe that the term is indefinite.

**B.    "searching neighboring triangles of the last triangle pair that holds the last intersection point" ('961 and '105 patents)**

| NSS | Autodesk |
|---|---|
| [ordinary meaning] | [indefinite] or alternatively, "iteratively searching immediately adjacent triangles of the current intersecting triangle pair to identify a next intersection point" |

22.    I understand that NSS has argued that the phrase "searching neighboring triangles of the last triangle pair that holds the last intersection point" has a plain and ordinary meaning and requires no construction.  I disagree with this position because the phrase "searching neighboring triangles of the last triangle pair that holds the last intersection point" does not and would not have a well-defined meaning to a POSITA.  Despite my professional experience, it is unclear to me what this phrase means.  It is not one that I have seen used in the field.

23.    It is also not clear from the '961 and the '105 patents what this phrase means.  This

process is not clearly described in the specifications and prosecution histories.  Claim 1 requires:

> ***searching neighboring triangles of the last triangle pair that holds the last intersection point*** to extend the intersection line until the first intersection point is identical to the last intersection point of the intersection line ensuring that the intersection line gets closed or until all triangles are traversed.

('961 patent and '105 patent, claim 1 (emphasis added).)  This "searching" suggests an iterative process, but it is not clear what it means to iteratively search "neighboring triangles of the last triangle pair."  For example, if read literally, "the last triangle pair" might refer to a pair of triangles that were analyzed in a previous iteration.  Or, if interpreted logically based on context, it might refer to the current triangle pair under consideration.

24.     If the claim language is read literally, as described above, "last triangle pair" refers to a pair of triangles considered in a previous iteration.  Then, as an initial matter, after a first pair of triangles is analyzed to identify a first intersection point (and assuming that no other intersection point has yet been identified in another pair of triangles), it is not clear what the "last triangle pair" or "last intersection point" would even mean.  These would not be defined.

25.     Second, even assuming we can overcome this initialization problem, the phrase "searching neighboring triangles of the last triangle pair that holds the last intersection point" does not explain how to extend an intersection line, as claimed.  Let us assume, as NSS does, that each triangle has three neighboring triangles, as shown by the white triangles in Figure 5.



FIG. 5

NSS' statement that "a triangle in a three-dimensional space has three neighboring triangles" (ECF No. 35 at 1) is consistent with my understanding that, within the context of the patents, "neighboring" means "immediately adjacent."  From the rest of the claim language, however, it is

not clear (a) which neighboring triangles, if any, would intersect, and (b) if intersections are found, which should be used to extend the intersection line.

26.    Assume that two triangles from two separate objects intersect.  In some cases, no additional intersections are found between the neighboring triangles of a first intersecting triangle from a first object and the neighboring triangles of a second intersecting triangle from a second object.  The following illustration shows a common example of such a scenario.



In this figure, the dark green triangle on the sphere intersects with the dark blue triangle on the box.  Due to the relative sizes and positions of the triangles, there are no intersection points between the dark green triangle's neighboring triangles (shown in light green) and the dark blue triangle's neighboring triangles (shown in light blue).  In this scenario, the claim language does not explain how to continue extending the intersection line.

27.    Conversely, there may be multiple neighboring triangles with intersection points, as shown below.

1
2
3
4
5
6
7
8
9
10
11
12



Here, the red dot represents an intersection point between dark green and dark blue triangles.  The multiple, neighboring triangles of the dark green and dark blue triangles also intersect, yielding additional, potential intersection points (drawn as purple dots).  But the claim language, standing alone, does not specify which of those neighboring, intersecting triangles should be used to identify additional intersection points.  Nor does the claim specify (where there are multiple potential intersection points for a given pair of neighboring triangles) which of the multiple potential intersection points should be used to extend the intersection line.  Thus, the claim language is indefinite.

28.   One possible construction of the phrase "searching neighboring triangles of the last triangle pair that holds the last intersection point" would be Autodesk's alternative proposal of "iteratively searching immediately adjacent triangles of the current intersecting triangle pair to identify a next intersection point."  Searching neighboring triangles of the current triangle pair under consideration to identify a next intersection point would allow the method to find intersection points that have not already been considered, consistent with Figure 4 and NSS' argument to "search for the first *not-traveled* intersection point."  (ECF No. 35 at 4 (emphasis added).)  This construction clarifies at least some of the ambiguity in the claim language.

29.     In summary, the phrase "searching neighboring triangles of the last triangle pair that holds the last intersection point" fails to inform a POSITA with reasonable certainty as to the scope of the claim.  Alternatively, to the extent this phrase can be construed, it should be construed in a manner consistent with Autodesk's proposed construction.

**C.     "regrouping facets in separate steps that includes copying triangles, deleting triangles, reversing the normal of each triangle of a geometric object, and merging reserved triangles to form one or more new extended triangle sets" ('961 and '105 patents)**

| NSS | Autodesk |
|---|---|
| construed "new extended triangle sets" to mean "the product of regrouping facets" | [indefinite] or alternatively, "regrouping the extended triangles for a Boolean operation that includes copying triangles, deleting triangles, reversing the normal of each triangle of a geometric object, and merging reserved triangles to form one or more new extended triangle sets consisting of triangles" |

30.     I understand that NSS has not sought construction of the phrase "regrouping facets in separate steps that includes copying triangles, deleting triangles, reversing the normal of each triangle of a geometric object, and merging reserved triangles to form one or more new extended triangle sets," although NSS has argued that the term "new extended triangle sets" means "the product of regrouping facets."  NSS' silence regarding the broader phrase suggests that NSS believes that "regrouping facets in separate steps that includes copying triangles, deleting triangles, reversing the normal of each triangle of a geometric object, and merging reserved triangles to form one or more new extended triangle sets" has a plain and ordinary meaning.  I disagree.  The phrase "regrouping facets in separate steps that includes copying triangles, deleting triangles, reversing the normal of each triangle of a geometric object, and merging reserved triangles to form one or more new extended triangle sets" does not have and did not have a well-defined meaning, including at the time of the alleged invention, to a POSITA.  Despite my professional experience, it is unclear to me what this phrase means.

31.     The individual "steps" in the disputed phrase, such as "copying triangles" or "deleting triangles," were known to a POSITA, but the phrase, as a whole, is ambiguous.  First, it is not clear what is meant by "separate steps."  For example, it is possible to copy a data structure representing a triangle from a first location in memory to another and then, later, to delete the

triangle from the first location.  This would seem to satisfy the claim's notion of "separate steps."
On the other hand, one could achieve the same result by moving the data structure representing
the triangle from the first memory location to the second in a combined operation.  A POSITA
would not know whether such a "moving" operation is a single step or consists of "separate
steps."  Additionally, the term "merging" is not well defined.  It is unclear from the specification
how "merging" can be separate from the "copying" and "deleting" steps that appear earlier in the
claim language.  A POSITA would understand that "merging" typically involves  copying pieces
of information from at least two original locations and then deleting the information from at least
one of the original locations.  "Separat[ing]" merging from copying and deleting steps might
require a different process that is not typically practiced in the art.  Thus it is not clear whether the
claims cover "merging" as typically understood by a POSITA or some special algorithm for
"merging" that the patentee does not explain.

32.    The most relevant evidence I could find to explain which Boolean operations the
claim intends to cover is not clear.  It is found in a passage of the specifications under the heading
"Regrouping the Facets."  ('961 patent, 8:7-60; '105 patent, 7:36-8:22.)  As described in this
passage, the purpose of the copying, deleting, reversing, and merging steps is to support "five (5)
kinds of Boolean operations."  ('961 patent, 8:9; '105 patent, 7:38-39.)  These include the
Boolean operations of "combination," "intersection," "exclusion," "difference," and "division."
Additional ambiguity arises because, as the specifications state, each of these Boolean operations
"has a different regrouping procedure."  ('961 patent, 8:10; '105 patent, 7:40.)  For example,
according to the patents, the "combination" operation involves the following steps:

> 1) Delete obscure triangles of object A.
> 2) Delete obscure triangles of object B.
> 3) Merge the triangles of object A and B.

('961 patent, 8:11-18; '105 patent, 7:41-47.)  The "copying" and "reversing the normal" steps
from the claim language are absent.  On the other hand, according to the patents, the "difference"
operation involves the following:

> 1) Delete obscure triangles of object A.
> 2) Delete NOT obscure triangles of object B.
> 3) Reverse the normal of every triangle of object B.

4) Merge triangles of object A and B.

('961 patent, 8:39-45; '105 patent, 8:1-8.)  Here, the "copying" step is absent.  Given that claim 1 recites "copying triangles, deleting triangles, reversing the normal of each triangle of a geometric object, *and* merging reserved triangles" (emphasis added), I interpret it to only cover those Boolean operations that include *all* of these steps.  Thus, to the extent it is possible to construe the phrase "regrouping facets in separate steps that includes copying triangles, deleting triangles, reversing the normal of each triangle of a geometric object, and merging reserved triangles to form one or more new extended triangle sets," the specification supports Autodesk's proposed alternative construction: "regrouping the extended triangles for a Boolean operation that includes copying triangles, deleting triangles, reversing the normal of each triangle of a geometric object, and merging reserved triangles to form one or more new extended triangle sets consisting of triangles."  Of the operations listed in the patent, only the "exclusion" operation seems to involve a copying step, a deleting step, a reversing-the-normal step, and a merging step.  But, as explained above, the claim phrase is nevertheless amenable to more than one interpretation.   I believe it is indefinite.  The specifications and prosecution histories of the patents fail to inform a POSITA with reasonable certainty as to the scope of the claim.

**D.     "surface trimming" ('961 patent claims 1 and 8)**

| NSS | Autodesk |
|---|---|
| map a surface to a BIOpTriangleSet and one of its trimming contours to an extruded shape, checking a triangle as left or right of a trimming contour, deleting left or right side triangles when trimming a surface, plus steps 2, 3, and 6 of the Boolean operation of Figure 4 | [ordinary meaning] |

33.     I understand that NSS has argued that the term "surface trimming" means "map a surface to a BIOpTriangleSet and one of its trimming contours to an extruded shape, checking a triangle as left or right of a trimming contour, deleting left or right side triangles when trimming a surface, plus steps 2, 3, and 6 of the Boolean operation of Figure 4."  I disagree with this position because "surface trimming" is a well-known term of art, and I have seen no evidence that the

patentee attempted to redefine "surface trimming" in the asserted patents.  Quite simply, "surface trimming" means to trim, or cut a surface along a curve or contour line.  For example, one could imagine a hedge with a curved top that is subsequently cut off so that the top of the hedge is parallel to the ground.  If this cutting operation were performed on the surface of a three-dimensional model, it would be an example of surface trimming.  Claim 8 of the '961 patent is consistent with this understanding.  It recites, "checking each triangle whether it is obscure or visible when *trimming a surface patch with a trimming contour*. . . ."  ('961 patent, 10:55-57 (emphasis added).)

34.     NSS' proposed construction would only confuse a jury.  The term "BIOpTriangleSet," incorporated into NSS' construction, is not a known term of art.  Indeed, as explained below, despite my professional experience, I have not seen the term BIOpTriangleSet used outside the context of NSS' patents.  NSS' proposed construction, which includes not just "BIOpTriangleSet" but also a series of unspecified steps copied from the specification, would be meaningless to a jury.

35.     NSS' construction appears to rely on a passage in column 2 of the '961 patent's specification.  (*See* '961 patent, 2:43-52 ("The process of the said surface trimming command contains six (6) steps, too.  Initially, this system maps a surface to a BIOpTriangleSet . . . .").)  This specification passage appears to describe a series of steps that an embodiment of the patent *uses* to carry out surface trimming, but this passage does not purport to redefine "surface trimming."  A POSITA would understand that there are other potential algorithms for performing "surface trimming."  Thus, NSS' reference to the specification does not change my opinion that "surface trimming" should be given its ordinary meaning in construing the claims of the '961 patent.

1

### E.   "regular points" ('961 patent claim 8)

| NSS | Autodesk |
|---|---|
| Regular points are definite, each of which is a Point3dEx located on a surface but not on an intersection line.  If we compare "regular points of BiOpTriangleSet" and "points of the intersection lines," then its meaning is clear. | [indefinite] |

36.     I understand that NSS has argued that "regular points" are "definite, each of which is a Point3dEx located on a surface but not on an intersection line."  I disagree with this position.  I first note that "regular points" does not have and did not have a single, well-defined meaning, including at the time of the alleged invention, to a POSITA.  For example, depending on context, "regular points" might refer to points that are evenly spaced in a grid.  Alternatively, depending on context of usage, "regular points" might refer to the result of using a "regular expression" or to points that are not "special," *i.e.*, points that are "regular."

37.     Since "regular points" does not have a customary meaning to a POSITA, I searched for its meaning in the '961 patent itself.  When the term "regular points" is read in the context of the claims and specification, a POSITA would not understand what is meant by "regular points," as claimed.  The term "regular points" appears only twice in the patent, in claims 8 and 18, as part of the phrase "setting m_ID of regular points of BIOpTriangleSet of the concerned patch to be 0."  This language indicates only that "regular points" must be "of BIOpTriangleSet" and must have an associated "m_ID."  The claims do not describe what "regular points" are or provide any meaningful structural limitations.  For example, the claim language could be interpreted to require taking a set of points and then setting their "m_ID" to be zero, thus creating "regular points," or it could be interpreted to require taking a set of "regular points" and setting their "m_ID" to be zero.  Moreover, the term "regular points" is not even mentioned, let alone defined, anywhere in the specification.  Based on the specification, it is unclear whether there are any points that are not "regular points."  The specification does not provide objective boundaries for a POSITA to determine whether a point is a regular point or not.  Thus, the term is ambiguous and not capable of construction.  As the specification and

prosecution history of the '961 patent fail to inform a POSITA with reasonable certainty as to the scope of the claim, I believe that the term is indefinite.

### F.      BIOpTriangleSet" ('961 patent)

| NSS | Autodesk |
|---|---|
| A BIOpTriangleSet is a triangle set built for Boolean operations or surface trimmings. | [indefinite] or alternatively, "a set of triangles represented by a data structure including a set of three-dimensional points and a set of triangle data structures, wherein each triangle data structure of the set of triangle data structures comprises information related to points, a plane, a normal, three immediately adjacent triangles and an index of the respective triangle" |

38.      I understand that in its Patent Local Rule 4-2 disclosures, NSS previously argued that the term "BIOpTriangleSet" should be given its "ordinary meaning," but that in the Joint Claim Construction and Prehearing Statement, NSS has argued that the term "BIOpTriangleSet" means "a triangle set built for Boolean operations or surface trimmings."  To the extent that NSS believes its current proposal reflects the "ordinary meaning" of "BIOpTriangleSet," I disagree with NSS because "BIOpTriangleSet" is not a known term of art.  In my professional experience, this is the first time I have seen this term used.  It does not have and did not have an ordinary and customary meaning, including at the time of the alleged invention, to a POSITA.

39.      Since "BIOpTriangleSet" does not have a meaning to a POSITA, I searched for its meaning in the '961 patent itself.  The closest thing I could find to a definition of a "BIOpTriangleSet" was not actually written in English, but instead, in pseudo-code (i.e., text that resembles computer source code but would not actually run on a computer):

1
2

The Boolean Operation method described in this inven-
tion defined three (3) key classes: BIOpTriangleSet,
Triangle3dEx, and Point3dEx.

3
4
5
6
7
8
9
10
11

```
class BIOpTriangleSet
{
        DataSet<Point3dEx>          m_PointSet;
        DataSet<Triangle3dEx>       m_TriangleSet;
};
class Point3dEx : Point3d
{
        DataTypeII          m_ID; // position and sequence index
        DataTypeIII         m_X, m_Y, m_Z; // DataType III may
                            be different from DataTypeI
};
class Triangle3dEx : Triangle3d
{
        Point3dEx           *m_Points[3];
        DataTypeII          m_ID;
        Plane               m_Plane;
        DataTypeIV          m_Normal[3];
        Triangle3dEx        *m_NeigTri[3]; // neighboring triangles
};
```

12   ('961 patent, 4:37-57.)  The patent states: "The Boolean Operation method described in this

13   invention *defined* three (3) key classes: BIOpTriangleSet, Triangle3dEx, and Point3dEx."  (*Id.* at

14   4:37-39 (emphasis added).)  The '961 patent does not attempt to "define" a BIOpTriangleSet in

15   plain English.  Instead, from the pseudo-code above, a POSITA could gather that each

16   BIOpTriangleSet is defined to include a "Point3dEx" and a "Triangle3dEx."  These terms, just

17   like "BIOpTriangleSet" are not terms of art; they are meaningless outside the context of the

18   asserted patents.  From context, I interpret the above pseudo-code to mean that a "Point3dEx" is a

19   set of three-dimensional points and that a "Triangle3dEx" is a set of triangle data structures.

20   Furthermore, the above pseudo-code indicates that each "Triangle3dEx" includes information

21   related to a set of points, an index (m_ID), a plane, a normal, and three "neighboring triangles."

22   Based on the pseudo-code above, the most reasonable construction of "BIOpTriangleSet" is "a set

23   of triangles represented by a data structure including a set of three-dimensional points and a set of

24   triangle data structures, wherein each triangle data structure of the set of triangle data structures

25   comprises information related to points, a plane, a normal, three immediately adjacent triangles

26   and an index of the respective triangle."

27          40.     But I emphasize that this construction is based on pseudo-code and that the

28

1   patentee did not attempt to define "BIOpTriangleSet" in plain English.  Thus, it is not clear from

2   the specification whether "BIOpTriangleSet" refers to the precise data structure "defined" in the

3   pseudo-code or to something broader.  The specification and prosecution history of the patent fail

4   to inform a POSITA with reasonable certainty as to the scope of the claim.

5   **G.     "according to m_ID of the member m_Points of each triangle, deciding whether it is a boundary triangle" ('961 patent)**

| NSS | Autodesk |
|---|---|
| Definite.  A boundary triangle is a triangle, one or more points (vertices) are located on an intersection line, their ID's are not zero. | [indefinite] |

41.     I understand that in its Patent Local Rule 4-2 disclosures, NSS previously argued

that the phrase "according to m_ID of the member m_Points of each triangle, deciding whether it

is a boundary triangle" should be given its "ordinary meaning."  I understand that in the Joint

Claim Construction and Prehearing Statement, NSS now argues that "[a] boundary triangle is a

triangle, one or more points (vertices) are located on an intersection line, their ID's are not zero."

To the extent that NSS believes its current proposal reflects the "ordinary meaning" of the

disputed phrase, I disagree with this position because "according to m_ID of the member

m_Points of each triangle, deciding whether it is a boundary triangle" is not a known term of art.

Additionally, the term "boundary triangle," as used in the claims and specification, does not

convey a clear and ordinary meaning to a POSITA.  Despite my professional experience, it is

unclear to me what the broader, disputed phrase means.  It is not one that I have seen used.  It

does not have and did not have an ordinary and customary meaning, including at the time of the

alleged invention, to a person of ordinary skill in the art ("POSITA").

42.     Since "according to m_ID of the member m_Points of each triangle, deciding

whether it is a boundary triangle" does not have meaning to a POSITA, and this phrase could

have more than one interpretation, I searched for its meaning in the '961 patent itself.  While the

disputed phrase is mentioned in claims 8 and 18, as well as in a single passage in the

specification, it is not defined anywhere.  The disputed phrase is mentioned as part of the

following passage:

> "When performing surface trimming, this system calls the followings procedure to determine whether a triangle is obscure.
> 1) Set the member m_ID of each Point3dEx of BIOpTriangleSet of the concerned surface patch to be 0.
> 2) Mark m_ID of Point3dEx of the intersection lines of the said patch in ascending or descending order, which is depending on whether the said line and trimming contour are in the same direction, for example, both of them are counterclockwise.
> 3) *According to m_ID of the member m_Points of each triangle, decide whether it is a boundary triangle.*
> 4) For each boundary triangle, decide it is to the left or right side of the trimming contour, and set its neighbors that are not boundary ones to be left or right."

('961 patent, 7:58-8:5 (emphasis added).)  The specification is nearly identical to the claim language and does not shed any light on what it actually means.  For example, it is not clear from the claims or specification which values of m_ID will result in a triangle being declared a "boundary triangle."  Additionally, neither the claim language nor the specification makes clear which "m_Points" need to be analyzed—all of them, or some undefined subset.  A POSITA would not know what type of analysis of "m_ID's" and "m_Points" fits within the scope of the claim language.

43.     The specification says to decide whether a triangle is a boundary triangle without providing any guidance as to what a boundary triangle is or how to determine whether a triangle is a boundary triangle.  As the specifications and prosecution histories of the patents fail to inform a POSITA with reasonable certainty as to the scope of the claim, I believe that the phrase "according to m_ID of the member m_Points of each triangle, deciding whether it is a boundary triangle" is indefinite.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed at West Lafayette, Indiana, on May 11, 2020.

_____
Daniel G. Aliaga